UNITED STATES OF AMERICA,

      Plaintiff,

v.

RICHARD ROBERT SENESE,

      Defendant.

_____/

## ORDER ON DEFENDANT'S MOTION TO SUPPRESS

**THIS CAUSE** is before the Court upon the Defendant's Motion to Suppress Physical, Testimonial and Statement Evidence (the "Motion"), ECF No. [18]. The Court has considered the Motion, the Government's response, the record and applicable law. In addition, the Court has evaluated the testimony and evidence presented at the hearings on the Motion, and is otherwise fully advised. For the reasons that follow, the Defendant's Motion is denied.

## I. BACKGROUND

Defendant Richard Senese is charged by Indictment with one count of knowingly and intentionally attempting to import into the United States five kilograms or more of cocaine in violation of 21 U.S.C. § 952 and § 960(b)(1)(B)(ii), and one count of knowingly and intentionally possessing with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(A)(ii). *See* ECF No. [10].

The relevant facts surrounding Defendant's arrest are as follows.[1] On the morning of February 20, 2018, United States Coast Guard officials encountered Defendant aboard his 28-foot Mako center console vessel bearing Florida registration number FL 9703 LD. At the time of

---

[1] The facts are derived from the parties' briefs and the testimony presented at the hearing.

the encounter, Defendant was the sole occupant of the vessel, which was disabled and offshore near West Palm Beach, Florida. The vessel was towed by a commercial salvage company to the Riviera Beach Marina, where it was boarded by members of the Coast Guard and officials from United States Customs and Border Protection ("CBP") to conduct an inbound border search of the vessel. While no evidence of illegal activity was found, each of the agents that questioned Defendant and searched the vessel noticed various irregularities.

First, CBP Agent Matthew Manning[2] testified that he performed a records check of the vessel, which revealed that the vessel had been flagged for a possible connection to maritime narcotics smuggling. In particular, a CBP agent conducting surveillance had previously observed the vessel parked at a residence in Broward County, Florida that was owned by the wife of a convicted drug trafficker ("Residence 1"),[3] the vessel had been registered to another convicted drug trafficker who was the brother-in-law of the convicted drug trafficker whose wife owned Residence 1,[4] and CBP had stopped and inspected the vessel in Fort Lauderdale, Florida around April 2017.

Defendant also provided nervous and inconsistent answers when questioned by Agent Manning. For instance, Defendant stated that he was returning from an overnight fishing trip to Bimini, Bahamas.[5] Prior to returning, Defendant re-fueled his vessel. On his way back to the United States, Defendant's vessel broke down, which caused him to drift for several hours before being encountered by the Coast Guard. However, when Agent Manning asked him where he had

---

[2] Manning is a Marine Interdiction Agent with the CBP Office of Air and Marine. He is also assigned as a Task Force Officer with the Department of Homeland Security, Homeland Security Investigations ("HSI").

[3] It is unclear whether the information regarding the vessel being spotted outside of Residence 1 by an agent was included in the records check, as Agent Manning testified on cross-examination that the agent that conducted the surveillance informed Agent Manning that he had observed the vessel at Residence 1 as they drove together to the Riviera Beach Marina to speak with Defendant.

[4] Residence 1 is also the address that the brother-in-law has listed on his driver's license.

[5] Agents did observe a cooler with fish aboard Defendant's vessel.

stayed during his trip, Defendant was unable to provide the name of the place where he stayed and offered inconsistent statements regarding the amount of money he had paid to stay. Defendant was unable to produce any receipts or documentation relating to his stay. Defendant stated that he did not have any navigation devices with him, such as a "global positioning system" ("GPS"), but that he could safely navigate without one. Furthermore, when Agent Manning searched the Defendant's phone, he observed a small number of calls, text messages, and contacts, suggesting that the phone's contents had recently been reset or cleared. Defendant was not able to provide a definitive explanation and attributed the lack of activity to the fact that the phone was new.

During the border search of Defendant's vessel, agents noticed that multiple screws around the deck hatch cover behind the center console were loose, missing, or with tool marks indicating that the hatch had been removed or tampered with. Further indicating that the hatch had been removed or altered was caulking near the hatch that also appeared to be disturbed, as well as chips around the edge of the fiberglass. A search around and under the hatch did not reveal anything illicit.

Following the completion of the questioning and border search, the Riviera Beach Marina would not allow Defendant to keep his vessel there while he retrieved his truck and trailer. After being presented with a few options, Defendant decided, and the agents arranged, for the vessel to be towed to the Lake Worth Coast Guard Station dock in Riviera Beach. The Defendant travelled to Broward County via commuter rail to pick up his truck and the vessel was docked at the Coast Guard station. It was during this time that the agents placed a GPS tracking device on the vessel to determine if it was involved in drug trafficking.

The GPS utilized spot monitoring to track the vessel. Agent Manning explained that once the GPS tracker is placed on a vessel, it begins to broadcast a position. Once the vessel stops at a specific location, the agents set up an electronic boundary around an area, enabling them to receive an alert or notification when the GPS tracker leaves that area. The GPS tracker only allowed for 48 hours of monitoring time. Thus, if it took a technician two minutes, for instance, to log in (to the computer program that is utilized to monitor the GPS) and check the position of the tracker, then that would constitute two minutes out of the 48 hours of monitoring time available on the GPS tracker. According to the tracker log submitted into evidence at the hearing, from February 20, 2018 to March 17, 2018, the Government checked the tracker 21 times on approximately 18 different days.

The GPS data revealed that after Defendant retrieved the vessel from the Lake Worth Coast Guard station, the vessel: travelled to another location in Broward County ("Residence 2") that was owned by the convicted drug trafficker whose wife owns Residence 1; remained at Residence 2 until March 6, 2018, when it was moved to Residence 1; travelled up and down a canal behind Residence 1 on at least two days; returned to Residence 2 on March 16, 2018; and entered the water from the 15th Street boat ramp in Fort Lauderdale, Florida on March 17, 2018, headed toward the Bahamas. At that point, Agent Manning contacted the CBP Air and Marine Branch to inform the patrol aircraft that would be in the area to be on the lookout for the vessel.

The GPS tracker data revealed that the vessel travelled to Bimini, went to an area slightly north of Bimini known as Great Isaac,[6] and proceeded northeast to the town of Freeport in Grand Bahama Island, where it appeared to trailer onto land. The vessel then remained overnight at a house in a neighborhood known as Bahamia. The next morning, on March 18, 2018, the tracker

---

[6] Defendant had also stated that he had fished in Great Isaac when he was stopped on February 20, 2018.

showed that the vessel returned to Bimini, where it remained for a short period of time before returning to the United States.

Once the vessel began to return to the United States, Agent Manning again contacted the CBP Air and Marine Branch, who informed him that they had a scheduled air patrol going on that day, as well as two scheduled marine patrols covering the area where the vessel might enter the United States. Agent Manning requested for the two marine patrols to intercept the vessel if it was encountered. The CBP air patrol unit spotted the vessel with its sole occupant as it crossed the twelve nautical mile line toward Port Everglades, Florida, and relayed the vessel's position to the marine patrol units. However, once the vessel had entered the waters of the United States, the vessel once again became inoperable and was unable to proceed on its own. The vessel was ultimately intercepted by the two CBP marine patrols approximately ten to eleven nautical miles east of Port Everglades for an inbound border search.[7] When the vessel was located, the agents observed Defendant waving his arms over his head as if calling for help.

Once one of the marine patrols was alongside the vessel, CBP Agent Mark Samples, also a Marine Interdiction Agent with the Office of Air and Marine, asked Defendant where he was coming from and whether he needed a tow back to the mainland. Defendant stated that he did, as he was broken down and did not have any way of calling for assistance because he was out of cell phone range. Agent Samples and two other agents then boarded the vessel and began to ask Defendant routine questions regarding the nature of his trip. Defendant stated that he was returning from an overnight stay in Bimini, where he had gone fishing. The agents observed a

---

[7] According to the testimony of Agents Manning and Samples, the location where the vessel was interdicted was within the jurisdiction of the United States. Defendant has not disputed this fact.

cooler of fish aboard the vessel. Defendant also stated that he had gone to place sports bets for college basketball games and won $1,000.[8]

According to Agent Samples, Defendant provided some evasive and inconsistent answers to some of his questions. Defendant stated that his friend "Mike," whose last name he did not know, had dropped him off at the 15th Street boat ramp the previous morning. While Defendant correctly described the hotel, its location, and its owner, he could not remember the name of the hotel, nor could he produce any documentation related to his stay. Defendant also claimed that he did not have to pay to dock the vessel, even though Agent Samples knew that the dock master at the hotel and marina was very strict. Defendant, who said that he had only stopped by the hotel to check-in and eat some lunch that he had brought with him, admitted that he did not clear Bahamian customs, explaining that he returned to Bimini for the night after fishing in Great Isaac. That morning, he re-fueled before returning to the United States.

While Agent Samples questioned Defendant as the vessel was being towed back to shore, the two other agents conducted a standard, cursory border search of the vessel but did not find anything illegal. Nevertheless, the agents again noticed the same anomalies regarding the loose screws and bolts around the leaning post near the center console and the deck cover, as well as missing and/or peeled caulking around the deck cover that demonstrated signs of recent tampering. Adding to the agents' suspicion was the overall poor condition of the vessel, which did not seem well-equipped for that type of voyage.

Following Defendant's questioning, a determination was made by the agents on the voyage back to shore to tow the vessel for further inspection to a dock in Port Everglades that is used by the Broward County Sheriff's Office and law enforcement when they have interest in a

---

[8] Agent Samples obtained a verbal customs declaration from Defendant, who stated that he was not transporting any merchandise obtained from the Bahamas and that he did not have more than $10,000 in monetary instruments. As mentioned, Defendant stated that he had $1,000 that he won gambling.

vessel.[9]  Upon their arrival, the agents began their inspection with the aid of a Broward County Sheriff's Office narcotics detection canine.  During the ten to fifteen minute examination, the canine immediately alerted to the odor of narcotics in little airspaces near the fishing pole holders toward the rear of the boat, in the center console area, and in the access holes in the front bow on the right side of the vessel.  The agents proceeded to remove the leaning post and deck cover over the fuel tank near the center console and noticed a loose section on top of the fuel tank, indicating a false compartment.  Specifically, the agents observed that the fiberglass over the fuel tank moved along a seam as they stepped on it.  After removing the fiberglass-covered metal plate, the agents discovered numerous packages commonly used to transport drugs and that ultimately yielded positive results for cocaine.  Upon finding the suspected drugs, the agents placed Defendant under arrest and advised him of his *Miranda* rights.  Defendant invoked his right to counsel and declined to answer any questions.

Defendant moves to suppress all the physical and testimonial evidence obtained by the Government.  *See* ECF No. [18]. The Government has filed its response.  *See* ECF No. [25].  The Court held hearings on the Motion on June 1, 2018, and June 4, 2018.  *See* ECF Nos. [31]–[32].  The Court's Order on the Motion now follows.

## II.  LEGAL STANDARD

Defendant moves to suppress the evidence against him pursuant to Federal Rule of Criminal Procedure 12(b)(3).  "A motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented."  *United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir. 1985) (citing

---

[9] Agent Samples testified that it is common practice for a cursory search to be done before boats are brought back to land to conduct a more thorough search that cannot safely or easily be done at sea.

*United States v. Smith*, 546 F.2d 1275 (5th Cir. 1977)).[10]  "In short, the motion must allege facts which, if proven, would provide a basis for relief.  A court need not act upon general or conclusory assertions founded on mere suspicion or conjecture . . . ."  *Id.* (citing *United States v. Harrelson*, 705 F.2d 733 (5th Cir. 1983)).  While in certain well-defined situations the ultimate burden of persuasion may shift to the government upon an initial showing of certain facts by the defendant, "[i]t is well established that the burdens of production and persuasion generally rest upon the movant in a suppression hearing."  *United States v. Lincks*, No. 09–60187–CR, 2009 WL 3256745, at *3 (S.D. Fla. Oct. 7, 2009) (quoting *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977)).

## III.    DISCUSSION

Defendant contends that the search conducted on March 18, 2018, was illegal, that the placing of the warrantless GPS was an illegal search, and that the statements made by Defendant during the search on March 18, 2018, were obtained in violation of his Fifth Amendment rights. The Court will address each argument in turn.

### A.    The search on March 18, 2018, was reasonable.

Defendant first argues that the search conducted on the vessel on March 18, 2018, constituted an unreasonable search in violation of the Fourth Amendment.  In particular, Defendant contends that:

> The facts in this Case . . . reveal that [CBP agents] intentionally searched out and intercepted Mr. Senese's subject vessel under orders to stop, board and search same; and then, take him and his subject vessel into custody and tow it to the Broward County, Florida Sheriff's Office dock for another destructive search with the aid of a K-9 unit.  This means the searchs [sic] of Mr. Senese's vessel were not "administrative" safety and document inspections.  Rather the searches were always intended to be, 'and were conducted as', full criminal investigative searches without a warrant leading to an eventual destructive search, again

---

[10] Pursuant to *Bonner v. Prichard*, 661 F.2d 1206 (11th Cir. 1981), opinions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent in the Eleventh Circuit.

without a warrant, after Mr. Senese and his subject vessel were taken into custody by the Government agents.[11]

ECF No. [18], at 12. Defendant's arguments are unpersuasive. First, it is undisputed that Defendant and his vessel were subject to a border search as he was intercepted by customs agents after entering the United States. *See United States v. Moreno*, 778 F.2d 719, 721 (11th Cir. 1985) (noting that the point where a ship first docks after arriving from a foreign country is the functional equivalent of the border); *see also* 19 U.S.C. § 1581(a).[12] As such, the circumstances normally required by the Fourth Amendment for a search are not present. The Supreme Court has held that "the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior." *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985) ("Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant."). This is because the "Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004) (holding that § 1581(a) authorized customs officers, without any level of suspicion, to remove, disassemble, and reassemble an automobile's gas tank to look for contraband while the automobile was located at a secondary inspection area at the border). As a result, "searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by

---

[11] The only case cited by Defendant in support of his argument is *United States v. Cardona-Sandoval*, 6 F.3d 15 (1st Cir. 1993). However, unlike the present case, which deals with the interdiction of the vessel by CBP in American waters and its accompanying search, *Cardona-Sandoval* dealt with a vessel search by the United States Coast Guard on the high seas. The scope and authority for these two Government agencies to board and search vessels are different and derive from two separate statutes. *Compare* 19 U.S.C. § 1581(a) (CBP), *with* 14 U.S.C. § 89(a) (Coast Guard).

[12] "Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters or, as he may be authorized, within a customs-enforcement area established under the Anti-Smuggling Act [19 U.S.C.A. 1701 et seq.], or at any other authorized place, without as well as within his district, and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance."

stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border." *United States v. Ramsey*, 431 U.S. 606, 616 (1977); *see also United States v. Villamonte-Marquez*, 462 U.S. 579, 588–93 (1983) (finding that boats on inland waters with ready access to the sea may be hailed and boarded by customs officers with no suspicion whatever).

Border searches that go beyond the routine are nonetheless justified by "reasonable suspicion." *See Montoya de Hernandez*, 473 U.S. at 541 ("[T]he detention of a traveler at the border, beyond the scope of a routine customs search and inspection, is justified at its inception if customs agents, considering all the facts surrounding the traveler and her trip, reasonably suspect that the traveler is smuggling contraband . . . ."). The "reasonable suspicion" standard has been held to fit "well into the situations involving . . . smuggling at the border." *Id*. "Under this standard officials at the border must have a 'particularized and objective basis for suspecting the particular person' of . . . smuggling."[13] *Id*. at 541–42 (citing *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

Even assuming without deciding that the border search in this case was more than routine, the Court finds that the "facts, and their rational inferences, known to customs [agents on March 18, 2018,] clearly supported a reasonable suspicion" that Defendant was engaged in maritime narcotics smuggling. *See Id*. at 542. After Defendant was encountered stranded at sea, CBP agents boarded the vessel and began asking Defendant routine questions about his trip. Defendant, however, provided evasive and inconsistent answers to Agent Samples' basic

---

[13] Thus, Defendant's contention that the vessel was "intentionally searched out and intercepted" for the purpose of conducting a "full criminal investigative" search is irrelevant. As the Court explains below, the CBP agents' search, conducted pursuant to their statutory authority, was supported by particularized and common-sense facts giving rise to reasonable suspicion that Defendant was smuggling narcotics. In any case, Agent Samples testified that he was not made aware of any previous investigation or interdiction of the vessel until after they arrived at Port Everglades. At the time the vessel was interdicted, Agents Samples knew only that a "be on the lookout" had been issued for the vessel.

questions that raised the suspicion of the agents. For instance, Defendant claimed that he did not remember the last name of his friend who had dropped him off at the boat ramp the day before, that he did not know the name of the hotel where he stayed, that he did not have to pay dockage fees even though the agents knew that particular dock did not typically operate that way, that he did not clear Bahamian customs, and that he had no documentation or receipts in relation to his stay in Bimini. Beyond Defendant's varying and unreliable answers to simple questions, the CBP agents also noticed various irregularities with the vessel, including: the general poor condition of the boat, which did not seem well-equipped for the type of voyage Defendant was making; loose screws and bolts around the leaning post near the center console and the deck cover; and missing and/or peeled caulking around the deck cover that demonstrated signs of recent tampering. Based on their experience in maritime smuggling, the CBP agents determined that the vessel should be searched more thoroughly on shore.[14] It is clear, however, that this decision was not based on some unparticularized suspicion or hunch that Defendant was engaged in drug smuggling. Instead, the CBP agents' reasonable suspicion was supported by specific and objective facts and inferences gleaned from their experience in interdicting vessels engaged in narcotics smuggling.

In sum, the search of Defendant's vessel on March 18, 2018, was reasonable and not in violation of the Fourth Amendment.[15]

---

[14] Once they reached the mainland, the agents searched and discovered cocaine onboard the vessel after a narcotics detection canine alerted to the odor of narcotics. *See, e.g.*, *United States v. Dunkley*, 911 F.2d 522, 527 (11th Cir. 1990) (holding that an officer had probable cause to inspect further once a drug-trained dog alerted to the odor of drugs). Defendant briefly takes issue with the use of a narcotics detection canine to search the vessel. *See* ECF No. [18], at 14. However, in *United States v. Place*, 462 U.S. 696, 707 (1983), the Supreme Court held that a narcotics canine sniff is *sui generis* and not a search within the meaning of the Fourth Amendment.

[15] In his brief, Defendant did not specify which search he claims was unreasonable. A review of his substantive arguments, however, makes it clear that he is referring to the search on March 18, 2018. In any case, the same factors that were present during the March 18, 2018, search were also present during

### B.       The installation of the GPS device was an unreasonable search.

Defendant next argues that, under *United States v. Jones*, 565 U.S. 400 (2012), the warrantless GPS that was placed on his vessel on February 20, 2018, was an impermissible search in violation of the Fourth Amendment.  The Court agrees.

In *Jones*, FBI agents installed a warrantless GPS tracking device on Jones's vehicle and remotely monitored the vehicle's movements for 28 days.[16]  *See Id.*  Rather than rely on Jones's "reasonable expectation of privacy," the Court decided the case based on the Fourth Amendment's historical "property-based approach."  *See Id*. at 405.  Accordingly, the Supreme Court held that because the Government's physical intrusion and trespass on Jones's vehicle "would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted[,]" the "the Government's installation of a GPS device on [Jones's] vehicle, and its use of that device to monitor the vehicle's movements, constitute[d] a 'search.'"  *Id*. at 404–05.

Here, as in *Jones*, "the Government physically occupied private property for the purpose of obtaining information."  *Id*. at 404.  It is undisputed that the CBP agents failed to obtain a warrant—even though they had ample time between February 20, 2018, and March 17, 2018, to do so—and the Government has not argued that any of the exceptions to warrantless searches apply.  Instead, the Government contends that the current case is different from *Jones* because it "involves the installation of a GPS tracker on a vessel interdicted at the border."  ECF No. [25], at 6.  The Government is correct that the Fourth Amendment's protections "wane in the context

---

the search that occurred on February 20, 2018: namely, Defendant's inconsistent answers to basic questions surrounding his trip, as well as the evidence of tampering on the vessel itself.  What's more, prior to the search on February 20, 2018, Agent Manning conducted a records check of the vessel, which revealed its various connections to two convicted drug smugglers.  Thus, the search on February 20, 2018, was reasonable for the same reasons as the March 18, 2018 search.

[16] The FBI originally obtained a search warrant permitting it to install the GPS; however, the warrant authorized installation in the District of Columbia within 10 days, but the agents installed the device on the 11th day in Maryland.  *See Jones*, 565 U.S. at 402–03.

of the international border." *Id*. Indeed, as the Court stated in the previous section, the CBP agents' border search of the vessel and questioning of Defendant was reasonable.

However, by the time the CBP agents installed the GPS tracker on Defendant's vessel, the border search had been completed. As Agent Manning testified, after the agents searched the vessel and found nothing illegal, the border search was over and Defendant and his vessel were free to leave. Defendant was then presented with some options regarding where he could leave his vessel while he retrieved his truck and trailer, and he opted to have the agents take the vessel to the Lake Worth Coast Guard Station. It was at this point in time that the agents realized that they had an opportunity to covertly install the GPS tracker and, in fact, did so.

The warrantless installation of the GPS on the vessel following the conclusion of the border search constitutes its own, separate search. The Government has not pointed the Court to any post-*Jones* caselaw or authority that allows for the warrantless placement of a GPS tracker on a vehicle or vessel. Rather, the Government argues that the installation and use of the GPS tracker is a "minimally intrusive" infringement on privacy interests that allows for only 48 hours of monitoring time, *see* ECF No. [25], at 7–8, and implies that a warrant was not necessary because the "agents had reasonable suspicion at the time of the installation that [Defendant] was involved in criminal activity," *Id*. at 8. In support of this proposition, the Government references a question left open by *Jones*: that is, whether the attachment and use of the GPS device was nonetheless reasonable, and thus lawful, under the Fourth Amendment if supported by reasonable suspicion or probable cause. *See Jones*, 565 U.S. at 413. However, while the *Jones* opinion did not address this issue, the Court doubts that a warrantless search supported by reasonable suspicion or probable cause is sufficient to overcome the nature of the Government's intrusion—a trespass. Indeed, *Jones* made clear "the significance of property rights" in Fourth

Amendment analysis, as well as the Fourth Amendment's historical embodiment and "particular concern for government trespass upon the areas ('person, houses, papers, and effects') it enumerates." *Id*. at 405–06. Thus, to accept the Government's position would be to undermine the principal import of the Supreme Court's decision in *Jones*—that the Government's trespass on personal property for information-gathering purposes is inherently repugnant to the historical protections afforded by the Fourth Amendment. The warrantless placement and use of the GPS tracker on Defendant's vessel for 28 days, therefore, was an unreasonable search.

### C.     The Inevitable Discovery Doctrine.

Having concluded that the installation and use of the warrantless GPS was unlawful, the Court now considers, as the Government argues, whether the inevitable discovery exception to the exclusionary rule applies. The exclusionary rule serves to deter government misconduct by preventing the introduction of evidence obtained by the government illegally. *See Nix v. Williams*, 467 U.S. 431, 442–43 (1984). Under the inevitable discovery exception, if the Government can establish by a preponderance of the evidence that the information would have ultimately been recovered by lawful means, the evidence will be admissible. *See Id*. at 434. In the Eleventh Circuit, the Government must first establish a "reasonable probability that the evidence in question would have been discovered by lawful means." *Jefferson v. Fountain*, 382 F.3d 1286, 1296 (11th Cir. 2004). The Government must then show that "the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct." *Id*.

First, there was a "reasonable probability that the evidence in question would have been discovered by lawful means." *Jefferson*, 382 F.3d at 1296. Here, the GPS tracker provided the coordinates of the vessel. However, as the vessel returned to the United States on March 18, 2018, it became disabled and completely inoperable. Importantly, both Defendant and the CBP

agents testified that Defendant *was unable to call for assistance as he was out of cell phone range*. Thus, even if the GPS tracker had not been installed, there is a reasonable probability that either the Coast Guard or CBP would have encountered Defendant given that (1) CBP had an air unit and two marine units conducting their normal, scheduled patrols covering the precise area where the vessel entered the United States, and (2) the vessel was in fact encountered by the Coast Guard on a routine patrol on February 20, 2018, after it became disabled within American waters as it returned from the Bahamas. In other words, the vessel was encountered on February 20, 2018, under the exact same circumstances that Defendant found himself in on March 18, 2018—drifting in American waters on the way back from Bimini in an area routinely patrolled by government agents without any means of calling for assistance. And, as analyzed above, once Defendant was encountered by CBP, the search of the vessel and discovery of cocaine was lawful in light of the particularized facts, independent of any information provided by the GPS tracker,[17] giving rise to reasonable suspicion. *See supra*, at 8–11.

Defendant argued at the hearing that the discovery was not inevitable because if he was able to get back to shore with the help of Sea Tow, a commercial towing company with which he has a membership, Defendant would not have been required to immediately report to Customs as a result of the Small Vessel Reporting Program. Yet it is undisputed that Defendant had no way of calling Sea Tow, or anyone else for that matter, while he was adrift, and that Defendant never asked the CBP agents to call Sea Tow once he was interdicted. Instead, the testimony reflects that Defendant accepted the CBP agents' offer to tow him back. There is no reasonable or evidentiary basis, therefore, for the Court to consider Defendant's argument that Sea Tow was a viable option for him to return to the mainland.

---

[17] As previously mentioned, Agent Samples had no prior knowledge that the vessel had already been interdicted and searched.

The Government must also show that "the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct." *Jefferson*, 382 F.3d at 1296. "'Active pursuit' does not require that police have already planned the particular search that would obtain the evidence. The government must instead establish that the police would have discovered the evidence 'by virtue of ordinary investigations of evidence or leads already in their possession.'" *United States v. Johnson*, 777 F.3d 1270, 1274 (11th Cir. 2015) (quoting *United States v. Virden*, 488 F.3d 1317, 1323 (11th Cir. 2007)).

The Court finds that the Government has met its burden, as the CBP agents were "engaged in . . . lawful investigatory actions" prior to installing the GPS tracker on the vessel on February 20, 2018. *Virden*, 488 F.3d at 1323. In particular, it is uncontroverted that the vessel had been stopped and searched by CBP in April 2017, that a CBP agent had been conducting surveillance on the vessel, which led to an observation of the vessel at the residence of a known drug trafficker's wife, and that CBP had noted in their records that the vessel had various ties to two known and convicted narcotics traffickers. And, on the morning of February 20, 2018, CBP had interdicted and searched the vehicle after Defendant struggled to answer routine questions regarding the nature of his trip[18] and the observing of screws that were loose or with tool marks, missing or peeled caulking, and chipped fiberglass on the vessel. Thus, by the time the CBP agents installed the GPS tracker on February 20, 2018, the agents were already suspecting and investigating Defendant and the vessel for possible connections to maritime narcotics smuggling "by virtue of ordinary investigations of evidence or leads already in their possession." *Id*.

---

[18] Specifically, Agent Manning testified that Defendant: was unable to provide the name of the place where he stayed and offered inconsistent amounts regarding the amount of money he had paid to stay; could not produce any receipts or documentation relating to his stay; and admitted that he did not have any navigation devices with him but that he could safely navigate without one. Furthermore, when Agent Manning searched his phone, he observed a small number of calls, text messages, and contacts, suggesting that the phone's contents had recently been reset or cleared.

Regardless of the GPS tracker being installed, this information was available to CBP agents upon any subsequent interdiction of the vessel, along with their ability to ask questions and conduct searches of the vessel. Accordingly, "[t]he 'active pursuit' of the 'ordinary investigation' of the evidence 'already in [their] possession' would have led" them to the discovery of the drugs on March 18, 2018. *Johnson*, 777 F.3d at 1275 (holding that shotgun discovered by police during illegal search following a lawful traffic stop was admissible because although the police officer had not yet determined that he was going to impound the vehicle when he performed the illegal search, he would eventually have impounded the vehicle based on his investigation of the vehicle conducted prior to performing the illegal search); *United States v. Terzado–Madruga*, 897 F.2d 1099, 1115 (11th Cir. 1990) ("Even assuming that the identity of [the witness] was unknown to the investigating authorities at the time . . . [another party] was quite capable of identifying [the witness] . . . and . . . had voluntarily agreed to cooperate fully with authorities in their investigation. . . . [W]e have no doubt that the identity of [the witness] would have been discovered by normal police investigation despite the police misconduct and that the leads making the discovery inevitable were possessed by and being actively pursued by the police prior to the illegal interrogation."); *United States v. Brookins*, 614 F.2d 1037, 1048–49 (5th Cir. 1980) (holding that even though the investigating officers were not yet actively searching for the witness, inevitable discovery applied because the police were investigating other leads that likely would have alerted them to the identity of the key witness).

The Supreme Court has explained that the "interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police *in the same, not a worse position* [than] they would have been in if no police error or misconduct had occurred." *Nix*, 467 U.S. at 443 (emphasis

added). "Subtract the [planting and use of the GPS tracker] from the factual picture in this case and . . . nothing of substance" would have changed. *Jefferson*, 382 F.3d at 1297. CBP already possessed information in their system that revealed the vessel's numerous ties to two convicted narcotics smugglers and that it had been interdicted on two previous occasions. The Government, moreover, would likely have intercepted Defendant after his vessel became inoperable on March 18, 2018, just as they did on February 20, 2018. Finally, a more thorough search of the vessel following Defendant's inability to answer basic questions, along with the observed anomalies on the vessel demonstrating recent tampering, would have led to the discovery of the drugs. Because the inevitable discovery exception to the exclusionary rule applies, the Government is entitled to use any evidence derived from the illegal installation of the tracker.

### D. Defendant's Fifth Amendment rights were not violated.

Defendant argues that his Fifth Amendment rights were violated because: he was not read his *Miranda* warnings even though he was "in custody" of CBP agents once they boarded his vessel on March 18, 2018, and began questioning him; he could not have had a reasonable belief that he was free to leave due to his vessel being inoperable and adrift; and the questioning was done in an "unfair and inherently coercive context."[19]  *See* ECF No. [18], at 15–16.

Defendant is correct that the agents did not provide him with his *Miranda* warnings until he was placed under arrest after drugs were discovered on the vessel. In claiming that his Fifth Amendment rights were violated, however, Defendant ignores the immigration context of the questioning. Indeed, the Eleventh Circuit has long recognized that "[i]nterrogation at the border constitutes one notable exception to the constitutional protection of *Miranda*. Because of the

---

[19] Defendant has not specified what statements he is seeking to suppress. Instead, he seeks to suppress "any and all statements" made to the Government agents. *See* ECF No. [18], at 17.

overriding power and responsibility of the sovereign to police national borders, the fifth amendment guarantee against self-incrimination is not offended by routine questioning of those seeking entry to the United States. Hence, individuals arriving in this country are not entitled to *Miranda* warnings." *United States v. Lueck*, 678 F.2d 895, 899 (11th Cir. 1982).

"This circuit has held that aliens at the border are entitled to *Miranda* warnings before custodial interrogation." *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996) (citing *United States v. Henry*, 604 F.2d 908, 914 (5th Cir. 1979). "[W]hether interrogation is 'custodial' should be interpreted in the light of the strong governmental interest in controlling the borders." *Id*. (citing *Lueck*, 678 F.2d at 899). "The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer . . . are irrelevant."[20] *Id*.

In *Moya*, the Eleventh Circuit held that "questioning at the border must rise to a distinctly accusatory level before it can be said that a reasonable person would feel restraints on his ability to roam to the degree associated with formal arrest." *Id*. at 1120 (internal citations and quotations omitted). Among the factors the Eleventh Circuit considered included whether (1) the defendant was physically moved or restrained, (2) handcuffs were employed, (3) guns were drawn, (4) the defendant was booked, told of formal accusations, or told that he was under arrest, (5) the defendant asked to leave and was told he could not do so, or (6) the defendant made any admissions during the interview that would have led a reasonable person in his place to conclude that he would be arrested immediately. *See Id*. at 1119.

None of these factors are present in this case. The record is clear that the CBP agents boarded Defendant's vessel and asked him routine questions incident to a border stop and

---

[20] As a result, Defendant's contention that the CBP agents intentionally intercepted his vessel for "criminal investigative purposes" is immaterial. *See* ECF No. [18], at 15. As the Court has explained, the CBP agents' interdiction and routine questioning of Defendant was proper pursuant to their statutory authority to patrol the country's borders.

relating to the nature of Defendant's trip. At no point did the agents physically restrain Defendant, draw their weapons, employ handcuffs, place Defendant under arrest, accuse him of drug smuggling, or inform him that he was not free to leave. Nor did Defendant make any statements that would lead a reasonable person to believe that he would be arrested immediately. While technically Defendant could not physically leave while he was being questioned, this restriction was not due to the questioning, but to the simple fact that he was on a vessel being towed back to shore after having been adrift at sea.

Defendant was not "in custody" for *Miranda* purposes in a border-crossing context. As such, Defendant's Fifth Amendment rights were not violated.

## IV. CONCLUSION

The Court finds that the search of Defendant's vessel conducted by CBP agents on March 18, 2018, was reasonable, and that Defendant's Fifth Amendment rights were not violated. While the installation of the warrantless GPS on Defendant's vessel on February 20, 2018, was an unreasonable search, the drugs discovered aboard the vessel on March 18, 2018, were inevitably discoverable. Accordingly, it is **ORDERED AND ADJUDGED** that Defendant's Motion to Suppress Physical, Testimonial and Statement Evidence, **ECF No. [18]**, is **DENIED**.[21]

**DONE AND ORDERED** in Miami, Florida, this 27th day of June, 2018.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

---

[21] In the Motion, Defendant also sought to amend his pretrial custody. *See* ECF No. [18], at 18–20. However, at the conclusion of the hearing on the Motion, Defendant stated that he would withdraw that request should the Court deny the Motion.

Copies to:
Counsel of Record